MERRILL C. GILMORE AND ETHEL J. GILMORE, PETITIONERS, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56020.   Filed March 30, 1956.

*Merrill C. Gilmore, Esq.*, for the petitioners.
*Nat F. Richardson, Esq.*, for the respondent.

#### OPINION.

MULRONEY, *Judge:* The respondent determined a deficiency of
$598.34 in the petitioners' income tax for the year 1950.

All of the facts have been stipulated and they are herein incorporated
by this reference.

Merrill C. Gilmore and his wife, Ethel, residents of Ottumwa, Iowa,
filed a joint income tax return for the year 1950 with the then collector
of internal revenue for the district of Iowa at Des Moines, Iowa.
Merrill C. Gilmore will hereinafter be referred to as the petitioner.

In 1949 the petitioner owned 303 shares of stock in the Ottumwa
Hotel Company.   The Ottumwa Hotel Company was an Iowa cor-
poration and its assets consisted of the real and personal property
commonly known as the Hotel Ottumwa in Ottumwa, Iowa, and it
had in 1950 earnings and profits, before taxes, of $19,441.30.   The
hotel property was leased to a corporation in which Henry W. Snider
and his wife, Ethel, owned all of the stock.

On November 8, 1949, there was a meeting of the board of directors
of the Ottumwa Hotel Company (held in petitioner's law office) where
a letter from the Sniders was read.   In this letter, which was directed
to the board of directors, the Sniders called attention to needed re-
pairs of the hotel building, particularly the need for installing new
elevators, and they said: "We would like to acquire the Hotel build-
ing, by purchasing all the Capital Stock [2,299.8 shares par value
$100], or a substantial part of the stock" of the Ottumwa Hotel Com-
pany.   The letter goes on to offer $160 a share for all the stock "but
not less than 1,265 shares."

The board took no action on this offer.   On November 11, 1949,
there was a second meeting of the board called to consider the sale
of stock to the Sniders and it was stated that the Sniders had raised
their bid to $165 a share, "the purchase to include all the assets of
the Corporation."   At this meeting a committee was appointed to
investigate the possibility of securing a better offer.   At a meeting of

the board of directors held on November 14, 1949, it was decided to notify all of the stockholders (about 100) of the Snider offer of $165 a share. On November 26, 1949, the board of directors considered the following written offer from Henry and Ethel Snider:

To THE STOCKHOLDERS AND BOARD OF DIRECTORS OF OTTUMWA HOTEL COMPANY,

We will purchase all the shares of the capital stock of the Ottumwa Hotel Co., and pay therefore [sic] a price of one Hundred and Seventy Five Dollars per share. We will not, however, purchase any shares unless we shall be able to acquire at least a majority of the issued shares.

We will waive any claim to cash on hand, and to any U. S. bonds now held by the Ottumwa Hotel Co., and are willing that the cash and proceeds of the bonds, after payment in full of all indebtedness of the Company and income taxes for the year 1949, may be paid to the present stockholders.

*     *     *     *     *     *     *

We will pay the price of $175.00 per share as soon as the majority of the shares have been assigned and are ready for delivery to us. This offer will be kept open to December 20th, 1949, but unless a majority of the shares have been offered by that date, this offer shall be withdrawn.

Very Truly yours,

HENRY W. SNIDER
ETHEL R. SNIDER
signed,   Henry W. Snider

On December 12, 1949, the board of directors was advised that a majority of the stockholders of the Ottumwa Hotel Company had agreed to accept the offer from the Sniders to buy the stock at $175 per share. On that date the board adopted resolutions directing the secretary and treasurer of the Ottumwa Hotel Company to pay all indebtedness of the corporation and to pay or set aside a sum sufficient to pay its income taxes for the year 1949, and further directing him to pay the balance of money on hand, together with the proceeds from the sale of the United States bonds held by the corporation, to the stockholders of record on November 26, 1949, pro rata in proportion to the respective number of shares held by them. The resolution also directed that such payment to the stockholders was to be made prior to February 1, 1950, if possible.

Petitioner made transfers of some of his stock to members of his family, all after November 26, 1949, but it is enough to state it was all eventually transferred to the Sniders at $175 a share.

Pursuant to the board's resolution of December 12, 1949, it was determined that a payment should be made of $6.50 per share to the stockholders of record on November 26, 1949. These payments, made in 1950, were accompanied by a letter containing the following:

To THE STOCKHOLDERS OF OTTUMWA HOTEL COMPANY:

The enclosed check of the Ottumwa Hotel Company is the Final Dividend under the Company's old organization.

*     *     *     *     *     *     *

The funds on hand warrant payment of a dividend of $6.50 per share to the stockholders of record on Nov. 26, 1949. * * *

In 1950 the Ottumwa Hotel Company had earnings and profits, before taxes, of $19,441.30, and after the 1949 tax liability of $4,042.58 was paid in 1950, earnings and profits to the extent of $15,398.72 were available for distribution. The payments to the stockholders of $6.50 per share were made in 1950 and they amounted to $14,948.69. The payments were made from the earnings and profits of the company.

On January 31, 1950, the petitioner received from the Ottumwa Hotel Company a payment of $1,969.50 as his share of the distribution from the balance of the fund of cash and United States bond proceeds after payments of taxes and other obligations outstanding. Petitioner treated this amount as additional consideration received by him in the sale of his stock in Ottumwa Hotel Company. The respondent included this amount in petitioner's income for 1950 as a taxable dividend under section 115 (a) of the 1939 Internal Revenue Code. The nature of this payment of $1,969.50 by the Ottumwa Hotel Company to the petitioner is the sole issue before us.

Petitioner's argument is that the entire transaction was actually a disposition of the stock for $175, plus the aliquot portion of the cash and bonds ($6.50 per share). He argues he received the $6.50 per share as part of the consideration for his transfer of stock and he points out that if the Sniders had increased their offer to $181.50 and had taken all of the assets of the company then the respondent would not even contend the $6.50 would be a dividend to the petitioner. That may be true, but the offer that was made specifically excluded the liquid assets and the action of the board on December 12, 1949, accepting the offer directed the payment of "the balance of money on hand, and the proceeds of sale of U. S. Bonds held by the corporation, to the stockholders of the Ottumwa Hotel Co. pro rata in proportion to the respective numbers of shares held by them, such payments to be made to stockholders of record on November 26th, 1949."

This action by the board was a declaration of a dividend prior to the transfer of the stock to the Sniders. This fact distinguishes the case from *Phillip D. C. Ball*, 27 B. T. A. 388, affirmed on another issue sub nom. *Von Weise v. Commissioner*, 69 F. 2d 439. The Sniders had made a prior offer which specifically included all of the assets of the company. This prior offer was not accepted. It may be true the parties could have reached much the same result and have avoided some tax consequences to the stockholders by casting the transaction in the form of a higher purchase offer that would have included all of the quick assets. But this just was not done. To reach the same result it would have required some accurate foretelling on the part of the purchasers to determine probable earnings and liabilities, including tax liabilities, to the end of the year. The Sniders chose to make this offer, one that "waived" the quick assets after payment of indebtedness. In

effect it was an offer to purchase the hotel property by buying the stock after earnings had been distributed to the stockholders. It is true the actual distribution to the stockholders did not occur until after the stock had been assigned to the Sniders but the action declaring the distribution took place before such assignment. The mechanics of the sale necessitated waiting until the close of the year 1949 so that the rent income would be complete and the liabilities, including tax liability for the year 1949, be determined and paid. Petitioner's argument that the $6.50 per share was not made upon the action of the board but resulted from the contract between the individual stockholders and the Sniders is wrong. The Sniders made no contract with the individual stockholders beyond agreeing to pay them $175 a share for their stock. The Sniders did not agree to pay the stockholders $6.50 or any other sum from the surplus. They "waived any claim" to the surplus and consented that it "may be paid to the present stockholders." The payment to the stockholders could only be accomplished by board action. Such appropriate action was immediately taken by the board. The corporate distribution received by the stockholders was not a part of the consideration coming from the purchaser of the stock as was the case in *William B. Aull, Jr.*, 26 B. T. A. 862, cited by petitioner.

In *T. J. Coffey, Jr.*, 14 T. C. 1410, a situation similar to the one here was before the Court and we held that the corporate distributions there involved were not a part of the consideration for the sale of stock. We said at page 1417:

The purchasers did not agree to buy their stock and then turn over to them $190,000 and the Cabot payment in consideration therefor. From the testimony above set forth it is apparent that they were not interested in the Cabot payment, did not want it included in the assets of the corporation at the time they acquired its stock, and negotiated with petitioners to acquire stock of a corporation whose assets did not include the unwanted Cabot payment. The offer of April 10, 1941, accepted by petitioners, was to pay $190,000 for the stock, subject, however, to the condition precedent that petitioners were to receive the Cabot payment from the corporation, and we think it quite significant that petitioners did not transfer their stock to the purchasers until a resolution was passed by the board of directors assuring petitioners of the receipt of the Cabot payment. This action, taken by the board of directors on May 15, 1941, distinguishes the facts of the instant proceedings from those in *Philip D. C. Ball*, 27 B. T. A. 388, 400 (affd., on another issue, 69 Fed. (2d) 439; certiorari denied, 292 U. S. 655), cited and relied upon by the petitioners, where no distribution of part of the assets of a corporation was authorized by its directors prior to the transfer by the seller of his stock to the purchaser. * * *

Section 115 (a) of the 1939 Internal Revenue Code defines a dividend as any distribution made by a corporation to its stockholders out of earnings or profits accumulated after February 28, 1913, or out of earnings or profits of the taxable year. It has been stipulated that the earnings and profits of the Ottumwa Hotel Company for 1950, after taxes, were $15,398.72, and that the total distribution made by Ottumwa

Hotel Company to its stockholders in 1950 amounted to $14,948.69. There is no indication in the record that the distributions were made in liquidation, or partial liquidation, of Ottumwa Hotel Company. In fact, Ottumwa Hotel Company was not dissolved until December 28, 1951. When the stockholders, among them the petitioner, received the distributions in 1950 they were informed by the board that the "funds on hand warrant a dividend of $6.50 per share to the stockholders of record on Nov. 26, 1949." We hold that the distribution in 1950 to the petitioner was a taxable dividend under section 115 (a). Although the dividend resolution was passed by the board on December 12, 1949, for stockholders of record as of November 26, 1949, it also directed that such dividend payments were to be made "prior to February 1, 1950, if possible." The dividend payment to the petitioner was made on January 31, 1950, and we hold that the dividend was properly includible in the petitioner's income for the year 1950.

*Decision will be entered for the respondent.*